CONVERSE et al. v. PORTSMOUTH COTTON OIL REFINING CORPORATION.*

(Circuit Court of Appeals, Fourth Circuit. May 2, 1922.)

No. 1955.

1. United States ⬅️78—Contractor not exempted from liability for damage caused in execution of government contract, where not necessarily incidental to the work.

Under a contract with the United States for dredging work in a harbor, which required the contractor to make arrangement for disposing of the dredged material and provided that it should be responsible for any damage which might result from such operations, the fact that the contract was for government work and was performed to the satisfaction of the engineer in charge *held* not to relieve the contractor from liability for damage caused by filling up a creek with dumped material, where such damage was not necessarily incidental to the work, but other dumping grounds were available, the use of which would have avoided the injury.

2. Navigable waters ⬅️26(½)—Building structure in stream without permit held not to bar action for damages for obstruction of stream.

The fact that an oil-refining company, which obtained its water from a navigable stream, built a small structure in the stream to support its

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 258 U. S. ——, 43 Sup. Ct. 13, 67 L. Ed. ——.

intake pipe without a permit from the War Department, which structure did not obstruct navigation, *held* not to debar it from maintaining an action for damages for the filling up of the stream.

3. **Navigable waters** ⊂⇒26(1)—**Mandatory injunction to dredge stream wrongfully obstructed sustained.**

A mandatory injunction, requiring defendant by dredging to restore a navigable stream, which it had wrongfully obstructed by dumping operations, *held* not unauthorized because the dredging could not be done without authority from the War Department, in the absence of a showing that such authority had been refused.

4. **Injunction** ⊂⇒189—**Mandatory injunction to dredge stream sustained, though it did not direct method.**

A mandatory injunction, requiring defendant to dredge from a stream material with which defendant had wrongfully obstructed it, *held* not subject to objection because it did not direct the disposition of the material, and in the absence of a showing that the work was impracticable.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Suit in equity by the Portsmouth Cotton Oil Refining Corporation against H. P. Converse and Edwin P. Bliss, partners as H. P. Converse & Co., and the United Dredging Company. Decree for complainant, and defendants appeal. Affirmed.

Edward R. Baird, Jr., of Norfolk, Va., and Maco Stewart, of Galveston, Tex. (Baird, White & Lanning, of Norfolk, Va., on the brief), for appellants.

Thomas H. Willcox and J. W. Willcox, both of Norfolk, Va., for appellee.

Before KNAPP and WOODS, Circuit Judges, and McDOWELL, District Judge.

KNAPP, Circuit Judge. The appellee, Portsmouth Cotton Oil Refining Corporation, complainant below and herein so called, has been the owner for several years of a tract of land on the northerly side of Paradise creek, in Norfolk county, Va., where it has an extensive plant and carries on a large and lucrative business. Its operations require the use of large quantities of water, which it obtains from this creek under the riparian rights incident to its ownership of the adjacent land. Paradise creek is a small tidewater stream, which flows into the southern branch of the Elizabeth river. Prior to the acts complained of it was navigable, by vessels drawing up to around 5 feet of water, for some distance above complainant's property, and was in fact used by such vessels more or less frequently.

In April, 1919, the United States entered into contract with H. P. Converse & Co. for dredging certain areas in the Navy Yard at Norfolk, and doing certain other work, in accordance with detailed plans and specifications. The dredged material was to be deposited on lands described as H, I, and J; the first two belonging to the United States Housing Corporation and the third to complainant. This contract, or the work to be done under it, was sublet to the United Dredg-

ing Company; but it appears to be admitted that liability to complainant, if any there be, is the liability of both concerns.

During the progress of the work a great deal of mud and other material escaped from the dumping grounds into Paradise creek, with the result that its waters were polluted and its navigability destroyed. Indeed, the creek seems to have been filled up to such an extent as to hold very little water at low tide. In consequence there was expensive interruption of complainant's business, caused by lack of water, and considerable injury to its plant and mechanical equipment.

Accordingly, in June, 1920, while the work was still going on, complainant brought this suit, to restrain defendants from continuing to allow the dredged material to get into the creek, to recover the damages already suffered, and to require defendants to restore the creek to its former depth and condition. A temporary injunction, motion to vacate which was denied, stopped the deposit of material on the areas named and compelled defandants to dispose of it elsewhere. In due course answer was filed and the case tried. The trial court held, for reasons stated in its opinion, that the evidence sustained the allegations of the bill and entitled complainant to the relief prayed for, and referred the matter to Col. John C. Oakes, a United States Army Engineer, as special master, to inquire and report: (a) What was necessary to restore Paradise creek to its depth and condition before the work was begun; (b) what damage complainant had already sustained; and (c) what further damage it would sustain if the creek could not be restored to its former condition. In March, 1921, after extended hearing, the special master reported: (a) That complainant had been damaged to the amount of $8,753.56; (b) that the creek could be restored to its former condition at a cost of approximately $13,000; and (c) specifying the work to be done to accomplish that result.

Objections were filed to this report, and in July following the cause was recommitted to the special master to ascertain and report, among other things, whether complainant could be provided with sufficient water by reopening the old basin, or opening a new basin, in front of its plant, the size and cost of such a basin, and whether it could be maintained in future for the needed purpose. Some further testimony was taken, and a supplemental report submitted in September, to the effect, in substance, that the proposed method was impracticable and would not afford permanent relief. It is also stated in this report that the creek could not be placed in the same condition as before the dumping commenced, because the mud "was distributed over the whole bed of the stream, including the ordinary channel and the side slopes to the limit of high water"; that the only thing that can now be done is to excavate to an equivalent waterway; that the necessary size of a new channel had been carefully considered in making the former report; and that the dredging therein specified would provide an equivalent stream and give complainant as large a supply of water as it had before defendants began their operations. A further brief report in October contains nothing of importance, and reference thereto may be omitted.

The decree of November, 1921, overrules defendants' objections, confirms all the reports of the special master, gives complainant a judgment for $8,753.56, and grants a mandatory injunction as follows:

"The court doth further order and enjoin the defendants to proceed forthwith to restore Paradise creek in Norfolk county, Va., to the depth and condition in which it was immediately before they began the work mentioned in the bill of complaint, in accordance with the plan suggested in said reports, by excavating and removing from the bed of said creek sufficient material to provide a clear channel 50 feet wide and 3 feet deep at mean low water, with side slopes of not less than one vertical and three horizontal from the mouth of said creek to a point 1,000 feet above the site of complainant's plant, with a widening of the channel for 300 feet opposite complainant's plant, to form a basin from and including the channel to a line drawn parallel to the direction of the channel and passing through the suction of complainant's intake pipe."

From this decree defendants appeal.

[1] On the findings of the court below, amply supported by testimony, it cannot be seriously doubted that complainant has been damaged by the filling up of Paradise creek to the full amount of the money judgment awarded, or that the acts of defendants outlined above were the proximate cause of the damage. We come, then, at once to the question of liability. The argument pressed by defendants is in brief that the government designated the areas in which the dredged material should be deposited, and where it was in fact deposited; that the bulkheads or dikes and other structures provided for retaining the material in those areas and preventing its escape into the creek were satisfactory to the officer in charge and approved by him; that the work was accepted and paid for by the government as having been performed in compliance with the contract; and that, as matter of law, there is no liability for incidental damage resulting from the performance of government work in accordance with government directions.

The correctness of this proposition may be conceded when the incidental injury is the necessary and unavoidable consequence of doing the work; that is to say, when the work cannot be done without inflicting the injury. If the desired improvement of this Navy Yard could have been made in no other way than by depositing the dredged material where it would escape into Paradise creek, and thus deprive complainant of its needful supply of water, it might well be argued that the contractors could not be held responsible. Gibson v. United States, 166 U. S. 269, 17 Sup. Ct. 578, 41 L. Ed. 996; Scranton v. Wheeler, 179 U. S. 141, 164, 21 Sup. Ct. 48, 45 L. Ed. 126. But plainly that is not the case in hand. The improvement in question involved no necessity for filling up Paradise creek, nearly a mile distant, or affecting in any way the natural flow of its waters; nor did the government, in planning the improvement and providing for its execution, contemplate or intend any impairment of the creek or of the rights of riparian owners. This is evident from the provisions of specification No. 3844, made a part of the contract, which invited proposals for doing the work. Bidders were advised that they would have the option of using the hydraulic method, in which case the dredged ma-

terial was to be deposited in named areas, or of loading it on scows to be towed out to sea and dumped, which conclusively shows that interference with Paradise creek was in no wise necessary to the performance of the work. True, it is stated that, if the hydraulic method be used, "the material shall be deposited on areas H, I, and J, shown in the accompanying drawing"; but to this is added the further statement:

"Areas H and I are the property of the United States Housing Corporation, and area J is the property of the Portsmouth Company. While permission to dump on their land has been obtained informally from b-th corporations, each bidder will be required to make his own arrangements as to the dumping of the dredged material, and shall submit with his bid complete information regarding all arrangements which have been made."

And a letter from Converse & Co. to the Bureau of Yards and Docks, under date of April 14, 1919, three days before the contract was signed, says:

"Referring to deposit of waste material, we have obtained permission from the United States Housing Corporation and the Portsmouth Company for the disposal of the material on their lands."

This clearly shows that the deposit of material on the areas mentioned in the specification was not of the least importance to the undertaking, and justifies the inference that if defendants had failed to make satisfactory arrangements with the owners of those areas, they would have been free to provide themselves with other available dumping grounds, of which there were many, subject only to approval of the officer in charge. They did procure others when the temporary injunction was continued, and apparently without difficulty and without any objection on the part of the government. In short, the obtaining of dumping grounds was a matter with which the government was not concerned, and for which contractors were required to make their own arrangements. Confirming this view and refuting, as we think, the defendants' contention is the following provision in the contract itself, typewritten in the printed form:

"It is agreed and understood that any arrangements, agreements, or contracts with property owners or others, which may be necessary in connection with the pumping and depositing of the dredging material ashore, shall be an obligation assumed by the party of the first part under this contract, and, further, that failure on the part of any property owner or others to comply with the terms of such agreements or contracts shall not operate to release the party of the first part from the dredging obligation assumed in this contract. It is further agreed and understood that the party of the first part assumes all responsibility for the adequacy of bulkheads, dikes or other construction which may be placed by him for the retention of dredged material, and further that any damage which may result from the inadequacy of such construction, or which otherwise may result from the pumping or filling operations, shall be made good by the party of the first part."

This broad language manifestly covers not only the particular areas designated in the specification, but likewise all other areas for which arrangements had been or might be made by defendants. And the meaning of the provision as a whole seems too plain for discussion, especially so when account is taken of the purpose of the contract and the alternate methods allowed for its performance. The evident

intention was to require defendants to provide their own dumping grounds, giving them practically full liberty of selecting the same, and to charge them with full responsibility for any damage which might result from their dumping operations. It follows that they are liable to complainant for the injury found to have been caused by their wrongful acts, and cannot claim immunity on the ground that they were "doing government work under government directions." For as respects the matter in dispute—the disposition of dredged material—the "work" to be done was in reality a private enterprise, and the only "directions" were that defendants should make adequate provision for retaining the material in the areas of deposit, and be answerable to "property owners and others" for all the consequences of their failure to do so, and to this they expressly agreed. This is not saying that the contract itself gives complainant a right of action, but that it does serve to defeat the claim of nonliability because made with the government. We have examined all the cases cited by defendants and find none which sustains their contention on such facts as are here presented.

[2] In this connection it is argued that complainant cannot maintain the suit because it obtained water by means of a "structure," which it had placed in the creek without permission of the Secretary of War, and therefore in disregard of sections 9910 and 9910a of the Compiled Statutes of 1918. This argument comes with somewhat of ill grace from those who appear to have grossly violated these sections by filling up a navigable stream, not only without authority, but against the protest of the army officer in charge and the harbor commissioners of Norfolk. The structure referred to, built to support the intake pipe, was of inconsiderable size and so located as not to impede in the least the navigation of the creek. In a word, it was clearly one of that class of which the special master, himself the army officer in charge, says in his report:

"There was no permit granted the complainant for the structure in question. However, it is unfair to the complainant not to state in this connection that, while the law requires that all structures in navigable water must be approved by the War Department, such approval may be obtained after the structure has been built, and in the majority of cases of small structures in small streams no permit is taken out by the parties building the structures, nor is a permit required by the United States when such structures are discovered, unless some objection exists to the structures as they exist."

It would be enough to observe further that the unlawfulness of this insignificant structure, if it be unlawful, was purely a matter between the United States and complainant, and therefore furnishes no defense to the suit; but to this may be added that the substantial and valuable right of which complainant has been deprived is the right of a riparian owner to take water from the creek in a lawful manner. The particular method is unimportant, if it be one to which the War Department makes no objection, and surely complainant should not be denied redress for the injury it has suffered because, and merely because, the method employed by it was not sanctioned by formal permission. And this applies as well to the suggestion that complain-

ant had no riparian rights to water for the reason that the mouth of its intake pipe was located below low water mark.

[3] With this brief discussion of the question of liability, we turn to the objections to the mandatory injunction above quoted. It is urged in the first place that defendants cannot dredge Paradise creek or otherwise change its condition without the recommendation of the Chief of Engineers and the authorization of the Secretary of War, and that therefore they are commanded to do something which is not only prohibited by law, but the doing of which is made a punishable offense. It would perhaps be a sufficient reply to point out that, although the bill of complaint specifically prays for a mandatory injunction, the same in substance as the court below awarded, the answer of defendants sets up no such ground or reason for denying the relief demanded in this regard. Apart from this, however, the objection is without merit. It is an attempt to defeat the mandate with a technicality. The dredging directed to restore the creek will be perfectly lawful, and it must be presumed that any permit which may be needed to enable defendants to comply with the court's decree will be granted as a matter of course on application. They certainly are not to be excused from compliance without showing that they have in good faith applied for permission and been refused. The burden is upon them, and not upon complainant.

[4] Much the same may be said of the further objection that the decree is most difficult, if not impossible, of performance, and does not specify how the material is to be removed, or where deposited, and the like. We see little merit in this objection. The decree seeks merely to compel defendants to undo the wrong which they have committed. The required dredging undoubtedly involves some difficulty and considerable expense, but there is no such showing of impossibility or excessive hardship as would warrant this court in relieving them from performance. Nor can they justly complain because the decree simply prescribes the work to be done and leaves to them free choice of means and method. In short, it is their duty at least to make an honest effort to comply with the decree, since no sufficient reason for not doing so has been made to appear. It will be time enough to ask for modification when full compliance is shown to be impracticable, and this burden also they must assume.

Some attempt is made to show that the special master reached conclusions not supported by any evidence, but careful scrutiny of the record satisfies us that the claim is not well founded. He not only took a large amount of testimony himself, but had before him all the previous testimony, together with the numerous maps, drawings, blueprints, and other data which had been introduced. To the consideration of this evidence he brought the expert knowledge of a trained engineer, aided by personal familiarity with the situation. The reports bear witness to his painstaking study of the case and to his considerate treatment of defendants. We find in them nothing of material import which is not fairly inferable from the proofs.

The other contentions of defendants are covered by what has already been said, or are not deemed of sufficient importance to be made

the subject of mention. It is only repeating to add that the whole defense in this case rests on the assumption that defendants are not liable for the injury suffered by complainant because they were engaged in the performance of a government contract. That assumption is clearly erroneous, in our judgment, when the injury is at once unnecessary and easily avoidable, and especially when, as here, the contractor has expressly agreed to be responsible for any damage to "property owners or others" which may result from his operations. State of Pennsylvania v. Wheeling & B. Bridge Co., 54 U. S. (13 How.) 518, 14 L. Ed. 249; Harrison v. Hughes, 125 Fed. 860, 60 C. C. A. 442; Carver v. San Pedro, L. A. & S. L. R. Co. (C. C.) 151 Fed. 334; Red Star Towing & T. Co. v. Snare & Triest Co., 194 Fed. 672, 115 C. C. A. 66; Consolidated Coal Co. v. Knickerbocker Steam Towage Co. (D. C.) 200 Fed. 840.

The decree appealed from will be affirmed.