# WESTERN CONTRACTING CORPORATION
## *v.* TITTER, ET UX.

[No. 11, September Term, 1969.]

*Decided November 12, 1969.*

582

The cause was argued before HAMMOND, C. J., and MARBURY, ▮ BARNES, FINAN, and SMITH, JJ.

*George W. Constable,* with whom were *Richard J. White, Jr.* and *Constable, Alexander & Daneker* on the brief, for appellant.

*William B. Evans* for appellees.

BARNES, J., delivered the opinion of the Court.

This appeal principally involves the rights of a riparian owner of land on navigable water in Cecil County to recover damages in the Circuit Court for Cecil County (Mackey, J.) resulting from an obstruction of access to those waters by a contractor with the United States Army Corps of Engineers (Army Engineers), an agency of the Government of the United States, engaged in the improvement of navigation in those waters and the correctness of the charge of the trial judge to the jury.

The appellant, Western Contracting Corporation, (defendant below) was a successful bidder on a contract with the Army Engineers to do certain dredging work in the Chesapeake and Delaware Canal (C & D Canal). These operations began on March 22, 1966, and were completed on July 23, 1966. It took Western Contracting approximately one month after the conclusion of the dredging operation to assemble and mobilize its equipment and pipelines for transportation to its next job at Norfolk, Virginia.

The dredging operations were conducted by the use of a floating hydraulic dredge which removed debris and mud from the bottom of the C & D Canal and then pumped the materials, assisted by boosters, through a 24-inch pipeline to a disposal area located on property of the United States. This pipeline consisted of 500 foot lengths of pipe. The Army Engineers had originally directed Western Contracting to pump the material into a disposal area on Welch Point, but because the dike surrounding this disposal area had developed longitudinal and horizontal cracks, the Army Engineers authorized Western Contractors to use United States Government Disposal Area "D" located on the C & D Canal, approximately one mile west of the bridge at Chesapeake City.

The land of the appellees, Richard M. Titter and Elizabeth R. Titter, his wife, adjoins Disposal Area "D", and consists of 14.25 acres with a water frontage of approximately 680 feet on the south side of Back Creek (which is used as part of the C & D Canal Waterway), about one mile west of the Chesapeake City bridge.

During the early part of June, 1966, Western Contracting began to extend a single floating pipeline, resting on pontoons, from its dredge to Disposal Area "D" in order to dredge the area of the C & D Canal west of the Titter property. This floating pipeline was connected into pipes running into Disposal Area "D" on June 21 and pumped mud and debris through the lines from June 22 to July 23. This pipeline extended in the water across the front of the Titter property on Back Creek after it was connected with the disposal area pipes, but no part of the pipeline rested on the front land of the Titter property.

When Western Contracting terminated the dredging operations in order to transport the 500 foot long pipes by water to the new job near Norfolk, it was necessary to weld "blanks" or metal disks in the openings at each end of these pipes in order to make them watertight. The welding operation took place in a small mooring basin in front of land owned by the United States on the north

side of Back Creek approximately opposite the Titter property. Being unable to assemble all of the pipes in front of the Government property inasmuch as they would have protruded out into the channel of the C & D Canal and thus have impeded navigation, Western Contracting used the cove in front of the Titter property. Western Contracting deemed this cove to be the only available place in the vicinity where the pipes could be stored temporarily until there was sufficient room for them in the welding area, in that the other possible temporary assemblage area was at Welch Point some five or six miles west of the welding area.

The Titter property has a small screened-in one-story building, 16 feet by 12 feet, without heating, plumbing or electricity, and has no other improvements. The Titters, their family and friends, use this property from spring until autumn for swimming, fishing, boating, and picnicking. The Titters have never rented their property.

Mr. Titter testified that the pipeline and pipes denied the Titters the normal and peaceful enjoyment of their property and access to the water. There was a conflict in the evidence between the testimony of Mr. Titter and the testimony of Allen Dregg, a supervisor for Western Contracting, in regard to the number of pipes and pipelines, their location with reference to the Titter property and whether or not the pipelines were actually being used in the dredging operation.

Mr. Dregg testified that there was only a single pipeline placed in front of the Titter property which was in actual use until July 23 and that it was not until after that date, that pipes were stored in front of the property. Mr. Titter, on the other hand, testified that the single pipeline through which dredged materials were being pumped, did not go along the shoreline of the Titter property and that pipeline did not "bother him any," but what did bother him was the storage of the pipes, there being five to seven pipelines involved and West-

ern Contracting "left a bunch of pipes on the beach for the whole summer." [1]

Mr. Titter stated that he made numerous complaints to Mr. Dregg and requested the removal of the pipelines from in front of the Titter property and on each occasion was assured that they would be removed "right away." Mr. Dregg admitted on cross-examination that he had received these complaints and that he had told Mr. Titter that he "would take care of it." The pipes were not removed by Western Contracting until August 26 following a telephone call from the attorney for the Titters.

The only evidence in regard to damages was given by Mr. Titter, who estimated the damages at $2,000, and by James Reese Short, a real estate expert who testified for the Titters and who estimated the damages at $3,000. The jury rendered a verdict in favor of the Titters for $2,500, but the *ad damnum* clause in the declaration having claimed only $2,000, a remittitur was entered by the Titters for $500 and judgment was entered for $2,000 with interest and costs. After a motion by Western Contracting for a judgment N.O.V. or in the alternative for a new trial had been overruled by the trial court, judgment absolute was entered upon the verdict on January 28, 1969, from which Western Contracting took a timely appeal to this Court.

Western Contracting had moved for a directed verdict at the end of the plaintiff's case and again at the end of the entire case. Both motions were denied by the trial court. In instructing the jury, the trial court told the jury that this was a tort case and that the alleged wrong

---

1. We assume that this testimony means that the pipes were not placed upon the Titter land above the mean high water mark inasmuch as there was no exception by the Titters to the trial court's charge that the action was not a trespass case. If the pipes were found by the jury to have been placed by Western Contracting upon the Titter land above the mean high water mark, then Western Contracting would be liable to the Titters for damages resulting from their trespass *quare clausum fregit*. In no way would such a trespass be a "reasonable" activity of Western Contracting in connection with its improvement of navigation under its contract.

involved was not a trespass, but was an invasion of a qualified property right known as "riparian rights." The trial court further instructed the jury that the right was not exclusive but did give the riparian owner the right of access to the water and a right to engage in normal pursuits, swimming, boating, fishing and so forth. It was pointed out that the claimed deprivation of right was a temporary one not extending beyond August 26, 1966. The conflict in the testimony in regard to the number of pipelines, the time they were there, and the nature of their use was pointed out to the jury, followed by a proper charge in regard to the measure of damages. The trial court, however, did not charge the jury that the issue before them was the *reasonableness* of the activities of Western Contracting in connection with its improvement of navigation pursuant to its contract. In failing to do this, we are of the opinion that error was committed. Counsel for Western Contracting preserved this question on appeal by a seasonable objection to the trial court's charge. Counsel stated that if there were any liability on the part of Western Contracting, it "should be limited to the period of obstruction of access, which was not reasonably related to the work of dredging for the United States." Because of this error, the judgment will be reversed and the case remanded for a new trial.

(1)

First, we should consider the nature and scope of the riparian right involved in the present case. In *Causey v. Gray,* 250 Md. 380, 387, 243 A. 2d 575, 581 (1968), we had occasion to consider and review the Maryland law in regard to the nature of the title of land under navigable water and scope of the rights of the owner of the adjacent fast land in a case involving the apportionment between adjoining land owners of land created by accretion or man-made.

We stated:

"It should be kept in mind that the 'title' of

private owners to 'riparian land' is created quite differently from the title to fixed land. It is well established that the title to land under navigable water is in the State of Maryland, *subject to the paramount right of the United States to protect navigation in the navigable waters. Smith v. Maryland,* 18 How. (59 U. S.) 71, 15 L. Ed. 269 (1855); *Day v. Day,* 22 Md. 530, 537 (1865); *Smoot Sand & Gravel Co. v. Columbia Granite & Dredging Corp.,* 146 Md. 384, 388, 126 A. 91 (1924). The owner of the fast land, however, has a common law right to land formed by accretion adjacent to the fast land and has the right of access to the navigable part of the river in front of his fast land, with the right to make a landing, wharf or pier in front of his fast land, subject, however, to general rules and regulations imposed by the public authorities necessary to protect the rights of the public. When the statutory law grants the right to a riparian owner to extend his lot or to improve out to the limits prescribed by the public authorities, the riparian owner receives a 'franchise—a vested right, peculiar in its nature but a *quasi* property of which the lot owner cannot be lawfully deprived without his consent.' *B & O R. R. Co. v. Chase,* 43 Md. 23, 36 (1875)." (Emphasis supplied.)

The power of the United States in regard to navigation flows from the power to regulate commerce under Article I, Section 8, Clause 3 of the Constitution of the United States. In *Scranton v. Wheeler,* 179 U. S. 141, 21 S. Ct. 48, 45 L. Ed. 126 (1900), Mr. Justice Harlan for the Supreme Court of the United States stated, for that Court:

"All the cases concur in holding that the power of Congress to regulate commerce, and therefore navigation, is paramount, and is un-

restricted except by the limitations upon its authority by the Constitution."

(*Id.*, 179 U. S. at 162, 21 S. Ct. at 57, 45 L. Ed. at 137)

Later in the opinion in *Scranton,* it was stated:

"Whatever the nature of the interest of a riparian owner in the submerged lands in front of his upland bordering on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water. It is a qualified title, a bare technical title, not at his absolute disposal, as is his upland, but to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation." * * * "If the riparian owner cannot enjoy access to navigability because of the improvement of navigation by the construction away fror. the shoreline of works in a public navigable river or water, and if such right of access ceases alone for that reason to be of value, there is not, within the meaning of the Constitution, a taking of private property for public use, but only a consequential injury to a right which must be enjoyed * * * 'in due subjection to the rights of the public;'—an injury resulting incidentally from the exercise of a governmental power for the benefit of the general public, and from which no duty arises to make or secure compensation to the riparian owner." * * * "Consequently the agents designated to perform the work ordered or authorized by Congress had the right to proceed in all proper ways without taking into account the injury that might possibly or indirectly result from such work to the right of access by riparian owners to navigability."

(*Id.*, 179 U. S. at 163-165, 21 S. Ct. at 57-58, 45 L. Ed. at 137-138)

In *Yearsley v. W. A. Ross Construction Co.*, 309 U. S. 18, 60 S. Ct. 413, 84 L. Ed. 554 (1940), the Supreme Court of the United States held that a contractor working for the government in improvement of river navigation pursuant to a contract with the United States Government and under the direction and supervision of the Chief of Engineers of the United States, as authorized by Congress, is not liable for injuries caused to riparian owners as simply incidental to the authorized work.

Mr. Chief Justice Hughes for the Supreme Court, stated:

> "* * * it is clear that if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."
>
> (*Id.*, 309 U. S. at 20-21, 60 S. Ct. at 414, 84 L. Ed. at 557)

### (2)

It is well settled, however, that this immunity of the contractor doing work for the government in navigable waters does not protect the contractor from liability for his own negligence.

See Annotation entitled "Public Contractor's Immunity" 69 A.L.R. 489—where it is stated on page 490:

> "One who contracts with a public body for the performance of public work is entitled to have the immunity of the public body from liability for incidental injuries necessarily involved in the performance of the contract, where he is not guilty of negligence."

In *Gulf Refining Co. v. Mark C. Walker & Son Co.*, 124 F. 2d 420 (CCA 6, 1942), *cert. den.* (1942), 316 U. S.

682, 62 S. Ct. 1268, 86 L. Ed. 1755, Circuit Judge Simons for the Sixth Circuit, made it clear that although a contractor doing work for the government in accordance with its requirements is not liable to a third person for its incidental effects upon his property and there is no presumption of negligence, nevertheless "that immunity does not extend to liability for damage which results from the contractor's negligence." *Id.* at 425.

A case analogous to the instant case is *Converse v. Portsmouth Cotton Oil Refining Corp.*, 281 F. 981 (CCA 4, 1922), *cert. den.* 260 U. S. 724, 43 S. Ct. 13, 67 L. Ed. 482 (1922). In *Converse* the defendant contractor was engaged in dredging certain areas in navigable waters off the Navy Yard in Norfolk, Virginia. During the progress of the work, the plaintiff riparian owner was seriously injured when the creek on which its plant was located became polluted with silt allegedly resulting from the negligence of the contractor. Circuit Judge Knapp, for the Fourth Circuit, stated that the applicable law was that where a contractor performs work in compliance with a government contract in navigable waters, there is no liability resulting when the injury is incidental and the "necessary and unavoidable consequence of doing the work." *Id.* at 984. Judge Knapp, however, pointed out that the defendant contractor cannot claim immunity on the ground that he was "doing government work under government directions" when he had full discretion and responsibility for the manner in which the acts causing injury were carried out. In such a case, the contractor will be held liable for its own negligence and wrongful acts.

See also *Toy v. Atlantic Gulf & Pacific Co.*, 176 Md. 197, 4 A. 2d 757 (1939); *Hanrahan v. Baltimore City*, 114 Md. 517, 531, 80 A. 312, 318 (1911); and *Baltimore & Potomac R. R. Co. v. Reaney*, 42 Md. 117, 130 (1875).

Although Western Contracting was able to establish that it had a contract with the Army Engineers to widen and deepen the C & D Canal, by the oral testimony of Mr. Dregg, the written contract, itself, was never of-

fered in evidence. We cannot tell from the record whether or not there is any clause in the written contract which may be relevant to the question of liability of Western Contracting or what the effect of any such clause might be if one were incorporated in the written contract. Obviously we express no opinion upon these matters. Upon the remand, doubtless these possibilities may be explored.

> *Judgment reversed and case remanded for a new trial, the costs to be paid by the appellees.*