Dowhey, Judge,
delivered the opinion of the court:
The plaintiffs were lessees of 26-130- acres of submerged land in Willoughby Bay, Virginia, off from the Jamestown Exposition site, which they had leased, under the laws of Virginia, for oyster culture and were using for that purpose.
By the act of June 15, 1917, Congress authorized the President to take over for the United States the possession and title of the tract of land known as the Jamestown Exposition site, on Hampton Roads, Virginia, with certain adjacent lands, “ including all easements, rights of way, riparian, and other rights appurtenant thereto,” etc., and the land was partially described as “ bounded on the north and west by Hampton Roads and Willoughby Bay.”
On June 28, 1917, the President issued his proclamation, set out in Finding IX, declaring it to be a military necessity to take possession of said land for the uses of the naval service of the United States, and taking possession thereof. In said proclamation the language of the act of Congress is followed in describing the property taken, but it is also described by metes and bounds. One course in the description is along the line of a named street to the point of intersection with the line of low-water mark of “ Hampton Roads ” from which the next course is “ in a general northerly and easterly direction following the meanders of the line of low-water mark of the waters of Hampton Roads and Willoughby Bay to ” a point where the line leaves these waters.
Thus the authority to take was limited to low-water mark, a boundary which is also important because under the laws of the State of Virginia riparian rights extended only to low-water mark. Submerged lands beyond that limit belonged to the State, and the rights which the plaintiffs acquired as lessees of the State were in such submerged lands.
In the development of a naval operating base upon and adjacent to the lands taken the defendant constructed a bulkhead which extended across plaintiffs’ leasehold at! ■ such point as to inclose within the bulkhead something over a third thereof. This portion was filled and converted into *94 dry land by pumping in materials dredged from the outside in the dredging of channels and mooring places and was used as a part of the naval base, and in the dredging of a channel outside the bulkhead the portion of plaintiffs’ oyster beds outside the bulkhead was destroyed. Much of detail with reference to the work done, its jiurpose and effect, not necessary to repeat here, appears in the findings.
In connection with the construction of the bulkhead its exact location at this point in relation to low-water mark does not appear but, assuming plaintiffs’ oyster beds to have been properly located in submerged lands outside of low-water mark, the fact that the bulkhead cut off and inclosed a portion of the beds indicates that the bulkhead must have been built outside of low-water mark.
This being true it must also be true, as the facts found show, that the naval authorities who constructed the bulkhead did as a matter of fact take and use a part of plaintiffs’ oyster beds but it is not every such taking which imposes an obligation on the United States to pay. An essential element of a taking out of which there may arise the implied promise to pay upon which recovery is to be had in such cases, is authority to take. No officer of the United States can create an obligation against the United States to pay for property taken unless he had authority to take it. In the instant case the authority to take, emanating directly from Congress, was to take to low-water mark and this limitation properly and in more definite terms appears in the President’s proclamation. It can make no difference whether the naval authorities went beyond the prescribed limit through mistake or in flagrant exceeding of authority. The plaintiffs possessed no rights within the limits of the authorized taking.
But there is another principle upon which the defendant relies in justification of what was done and under which there is no liability to make compensation, and that is the dominant right of the sovereign to do whatever may be necessary, in navigable waters, for the improvement of navigation. There can be no doubt the plaintiffs’ rights in these submerged lands were subject to this dominant right of the *95 sovereign without compensation. The only question is whether the United States, in doing what it did, was in the exercise of this dominant right.
This large tract of land embraced within the provisions of the act of Congress and the President’s proclamation was taken for the use of the Navy of the United States. The act specifically provided for compensation, and compensation was made not only for the fast lands, but for appurtenant riparian rights. To the full extent of the taking, the obligation to make compensation was thus discharged. The very purpose for which the land was taken indicates the necessity for contiguous waters and navigable waters. There can be no doubt, therefore, that the United States intended, first, to take property and pay for it, and second, to make it available for its intended purpose by exercising its right to improve the navigability of contiguous waters as might be necessary.
The right to improve navigation can not be limited to the light to provide necessary channels between fixed points, even commercially more than that is necessary. And to the full extent that determined necessity exists the right to supply the need also exists. In this instance it involved channels for passage, depth of water for docking and mooring, submarine basins, etc.
It is said by plaintiffs that “A taking for naval purposes is not for purposes of navigation.” This statement might, under some limitations, be true, but hardly so when the “ naval purposes ” directly involve navigation. It would be strange indeed if the sovereign might exercise its dominant right to provide necessary facilities for commercial vessels but could not provide any additional facilities made necessary for the use of naval vessels. If twenty-foot channels perchance served all necessary commercial purposes the dominant power had exhausted itself when they were supplied and deeper channels might not be provided for naval vessels. Or because commercial vessels need not dock at navy yards, facilities for naval vessels can not be supplied. And it is said that, “ Purposes of navigation implies a use for the public good ” from which it is argued that “ the im *96 provement must be for a public use, in a public capacity, and not in a mere governmental capacity.” The distinction is rather difficult to comprehend and it is more difficult to comprehend that in the face of a great national emergency the furnishing of necessary facilities for the Navy is not for the common public good.
Again it is said that “ The Navy Department and the Secretary of the Navy were without authority to make an improvement for the purposes of navigation.” The argument is difficult to follow since the delegation of authority over navigable waters to the Secretary of War by Congress is recognized. But if the contention were well founded it could not serve the plaintiffs for it must result in the invoking of the well-established rule that unauthorized acts upon the part of its officers can impose on the United States no obligation to make compensation therefor. If plaintiffs were injured by such acts and they were in fact unauthorized their injuries resulted from a tort for which there is no redress in this court.
But we do not see proper basis for the contention that either the work in question was unauthorized or that it was not within the sovereign’s right to improve navigation. On the latter question the defendant has presented and discussed a number of the applicable authorities. We find it unnecessary to review them but cite the following: Lewis Blue Point Oyster Co. v. Briggs, 229 U. S. 82; Rocky Point Oyster Co. v. Standard Oil Company of N. Y., 265 Fed. 379; Hardin v. Jordan, 140 U. S. 371; Scranton v. Wheeler, 179 U. S. 141; Greerdeaf Lumber Co. v. Garrison, 237 U. S. 251; Gibson v. United States, 166 U. S. 269; Tempel v. United States, 248 U. S. 121.
We have concluded that the plaintiffs can not recover and that their petition must be dismissed.
Hat, Judge; Booth, Judge; and Campbell, Chief Justice, concur.
Graham, Judge, dissents.