Herbert COLLETTE and Robert Mistich, Plaintiffs,

v.

MARINE EXPLORATION COMPANY, Defendant and Third-Party Plaintiff,

v.

PHILLIPS PETROLEUM COMPANY, Third-Party Defendant.

Civ. A. No. 8473.

United States District Court
E. D. Louisiana,
New Orleans Division.
Jan. 29, 1963.

Luke A. Petrovich, Schoenberger & Petrovich, Buras, La., for plaintiffs.

John V. Baus, and John J. Weigel, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendant.

Paul O. H. Pigman, and Phillip A. Wittmann, Stone, Pigman & Benjamin, New Orleans, La., for Phillips Petroleum Company.

WEST, District Judge.

Plaintiffs, Herbert Collette and Robert Mistich, bring this suit to recover damages from respondent, Marine Exploration Company, for the value of oysters allegedly killed, and for damages to oyster bedding grounds allegedly caused by the oil exploration operations of respondent, Marine Exploration Company, in and around Little Bayou Chicharas, in Plaquemines Parish, Louisiana. Little Bayou Chicharas is a meandering bayou running generally north and south and emptying into Bay Chicharas on the south. It is surrounded by marshland accessible only by amphibious equipment such as marsh buggies.

Plaintiffs are the owners of a State oyster lease, bearing No. 13121, dated June 15, 1953, which covers 20 superficial acres of water bottom of Little Bayou Chicharas. The northern one-quarter of that portion of Little Bayou Chicharas covered by the plaintiffs' oyster lease is intersected at three different points by a barge canal known as Phillips Canal. This canal, which was dug many years prior to the times involved in this suit, was constantly subjected to heavy boat and barge traffic before, during and after the times herein involved. It is used primarily as a means of servicing oil rigs and wells located in the areas surrounding Little Bayou Chicharas. Phillips Petroleum Company, at all times pertinent to this suit, held a valid oil, gas and mineral lease dated November 22, 1940, and being duly recorded in the Conveyance Records of Plaquemines Parish, covering, among other properties, all of the same property covered by the plaintiffs' oyster lease.

In the course of their oil exploration activities, Phillips contracted with respondent, Marine Exploration Company, to do certain seismic work on their lease. Proper permits for this seismic work were procured by Marine from the Louisiana State Mineral Board, which permits authorized Marine, among other things, to conduct its seismic operations on all water bottoms owned by the State of Louisiana in Plaquemines Parish, Louisiana, including the water bottoms in the disputed area in Little Bayou Chicharas. According to the respondent's daily logs filed in evidence, the seismic operations which it conducted in close proximity to plaintiffs' oyster lease were done on August 2, 1957, August 30 and 31, 1957, and September 4, 1957. Plaintiffs contend that in the course of conducting these exploration activities, respondent caused damage to their oysters and bedding grounds by exploding dynamite charges in close proximity to their lease; by operating marsh buggies in close proximity to the oyster lease; and by traversing the oyster bedding grounds with their marsh buggies. Plaintiffs claim damage in the amount of $500 per acre for the permanent destruction of the entire 20 acres of oyster bedding grounds; $3.00 per sack for the total loss of all oysters on the lease, estimated by them at 3,200 sacks; and $10,000 for alleged damages to their good will and reputation as oyster fishermen.

Respondent defends on the grounds that it had a legal right, as agent of Phillips, under Phillips' oil, gas and mineral lease, and under its contract with Phillips, to conduct its seismic explorations; that it conducted its operations in a careful prudent manner, with due regard to the plaintiffs' rights under their oyster lease; and that in any event, plaintiffs have failed to prove any damages resulting from respondent's operations. Respondent also filed a third party claim against Phillips Petroleum Company, demanding judgment over against Phillips in whatever amount, if any, it, Marine, might be held to be liable to the plaintiffs. It further demands from Phillips attorney fees and all costs of defending this suit. This claim was based upon a contract between Marine and Phillips whereby Marine undertook to do the marine exploration and seismographic operations for Phillips, who in turn agreed to assume all responsibility for any claims for damages to oyster beds alleged to have been caused by Marine. Suit was originally filed in the State Court and then properly removed to this Court. Trial was had before the Court, without a jury.

■ The law of Louisiana with respect to the rights of the owner of an oil, gas or mineral lease, and the rights of the owner of an oyster lease where both cover the same area is well settled. The owner of an oil, gas and mineral lease, such as Phillips Petroleum Company in this case, has a legal right, and in fact, is obligated to reasonably and properly develop the area covered by the mineral lease for oil production. On the other hand, the owner of a State oyster lease, such as the plaintiffs in this case, which covers the same area as that covered by the oil, gas and mineral lease, may exercise all of the rights acquired under his lease, but these rights are subject to the right of the owner of the oil, gas and mineral lease to explore for oil in the same area. Every person must so exercise his right as not to unduly or negligently injure others. The burden of proof is upon the plaintiff to show that the defendant, in the exercise of its rights under the mineral lease, failed to use due care and thus negligently caused injury or damage to the plaintiff. Vodopija v. Gulf Refining Co., 5 Cir., 198 F.2d 344. Under the laws of Louisiana, the co-existing rights of the holder of an oyster bedding lease and the holder of a mineral lease covering the same property must be so exercised by each party as not to unduly injure or damage the other. Both parties have a right and an obligation to conduct their respective operations and to so conduct them in a manner that will not negligently cause damage to the other. Proof in this case is therefore required from which reasonable minds could infer that the defendant did something which a reasonably prudent person under the same circumstances would not have done or had done it in a way in which a prudent person would not have done it, and had thus caused damage to the plaintiff. Collins v. Texas Company, 5 Cir., 267 F.2d 257. And of course, even if such negligence on the part of the defendant has been proved, the plaintiff must also carry the burden of proving by a preponderance of evidence the amount of damages caused by such negligent operations.

■ From the evidence in this case, it is abundantly clear that there is no merit whatsoever to the claim of the plaintiffs that any damage was done to the oysters or to the oyster bedding grounds by the seismic "shooting" consisting of exploding charges of dynamite at various intervals about 75 feet below the surface of the ground. All of the evidence in the case showed conclusively that no damage of any kind was caused by this particular activity. Consequently, any damage that the plaintiffs might have suffered to their oysters or bedding grounds would necessarily have been caused only by the activities of the marsh buggies traversing in and around the area of the lease. Also, there was no evidence of any kind introduced to substantiate the claim of damages suffered to the good will or reputation of the plaintiffs as oyster fishermen,

and consequently, there is no merit to that claim.

This Court is not at all impressed with the testimony of either of the plaintiffs concerning the alleged damage. Furthermore, in view of the remainder of the testimony introduced at the trial of this case, the Court is of the opinion that the plaintiffs have completely failed to prove by anything approximating a preponderance of the evidence that the damages claimed by the plaintiffs were caused by any of the operations of the respondent, Marine Exploration Company. Furthermore, even if the Court were to find that some damage had been caused by the operation of this respondent, the plaintiffs have completely failed to prove to any reasonable degree of certainty the amount of such damage.

In the plaintiffs' complaint, they allege that the entire 20 acres of the oyster lease were permanently damaged and that all of the oysters thereon were killed as a result of respondent's activities. In addition to the allegations of the complaint itself that the entire 20 acres were totally destroyed, the plaintiffs had previously answered interrogatories under oath in which they stated that the entire lease had been completely destroyed as oyster bedding grounds. However, during the course of the trial, Mr. Collette could never quite make up his mind whether 20 acres were damaged as he had initially claimed, or whether "four or five acres" were damaged, or finally whether it was "six to ten acres" that had been destroyed by these operations. Furthermore, the Court cannot overlook the fact that these same plaintiffs, Mr. Collette and Mr. Mistich, filed another suit, which is still pending in Division B of this Court, entitled "Robert Mistich and Herbert Collette versus William K. Davis and J. Ray McDermott & Company, Inc.", being Civil Action No. 8954, in which suit they are suing for damages to the same oyster bedding grounds allegedly caused by the respondent in that suit, J. Ray McDermott & Company, Inc., as a result of dredging operations conducted by them in February, 1959. In that suit, and in interrogatories answered in connection therewith, these same plaintiffs declare under oath that prior to the dredging operations of McDermott in February, 1959, the entire 20 acres of water bottom covered by this lease were in excellent condition and suitable for the bedding and cultivation of oysters, and that as a result of the dredging operations of McDermott in February, 1959, the entire 20 acres were totally destroyed as oyster bedding grounds, and that the dredging operations had killed 3,000 sacks of oysters. Yet, during the trial of the present suit, they testified at varying times that anywhere from 5 to the entire 20 acres of lease were permanently destroyed by the operations of the respondent, Marine Exploration Company, in 1957, and that thereafter, the entire lease was no longer suitable for oyster bedding or cultivation.

In the instant case, the plaintiff, Mr. Collette, testified that as a result of the operations of the respondent, Marine, the bedding grounds covered by this lease were completely destroyed and no longer suitable for the bedding of oysters. However, in answer to interrogatories propounded in the McDermott suit, it was stated, under oath, that in September, 1957, which was after the alleged damage caused by the respondent in the present case, plaintiffs planted 3,000 sacks of oysters on this lease. In the present suit, both plaintiffs testified that all of the oysters on this lease were destroyed as a result of the respondent's operations, and that the lease was no longer suitable for the cultivation of oysters. However, in the McDermott suit, these same plaintiffs, in answer to interrogatories therein propounded, stated under oath that in February, of 1959, there were 3,000 sacks of oysters on these bedding grounds, and that all 3,000 sacks of oysters were destroyed as a result of the dredging operations of McDermott. During the trial of the present case, the plaintiff, Mr. Collette, testified that there had been no sales of oysters from this lease since December, 1955. Yet, in answer to interrogatories propounded in the

McDermott suit, it was stated under oath that the plaintiffs had realized $8,177.85 from sales of oysters from this lease during the year 1957. During the trial of this present case, the plaintiffs introduced into evidence a Penworthy notebook containing entries which purported to be entries in connection with their oyster operations, and which entries were allegedly made contemporaneously with the removal of oysters from their various leases. These were the reports and records by which plaintiffs were attempting to prove the amount of their damages. The entries in the Penworthy notebook are dated as far back as January, 1955, with some notations even bearing the date as early as 1947. However, during the trial, it was finally agreed and stipulated between counsel for all parties that this particular Penworthy notebook was not even manufactured until October, 1957, and consequently, the entries therein contained could not possibly have been made contemporaneously with the removal of oysters from the various leases, including the lease in question, as had previously been testified to by plaintiffs.

These are but a few of the glaring inconsistencies in the testimony given by these plaintiffs. Their testimony simply cannot be given any weight whatsoever as evidence in this case. Also, the so-called books and records introduced by plaintiffs herein in an attempt to establish damages, were so obviously not kept in the regular course of the business of these plaintiffs that they are also entitled to no weight as evidence in this case. When the testimony of these plaintiffs is eliminated from this case, there is simply no other evidence by which their claim would be proved by any preponderance of the evidence.

There was an attempt made by the plaintiffs to establish the fact that the respondent's marsh buggies had actually traversed the oyster bedding grounds, thus destroying oysters thereon. But there was much less than a preponderance of evidence to that effect. There was, however, substantial evidence to the effect that the marsh buggies had operated in certain areas around the perimeter of the lease, and in close proximity to the lease, and that their operations had caused a trampling or flattening of the marsh grass in the areas adjoining the lease. There was some evidence to the effect that some of this dead marsh grass had found its way into the waters of the bayou, and dead marsh grass was found in some areas on the bottom of the bayou. Whether or not this condition had any causal connection whatsoever with the destruction of the oysters is highly doubtful. Dr. St. Amant, an expert in the field of oyster cultivation, testified that tides had washed dead marsh grass into the bayou, and he found it on the water bottom. On November 7, 1957, he found 61.6% of the oysters dead. But the testimony of Mr. Ferac, also an expert in the field of oyster bedding and cultivation, cannot be overlooked. He testified that in June, 1957, before any activities in this area by respondent, he made a survey of the oyster beds in question. At that time he found that there were three to four inches of mud and silt over the entire bayou bottom, and over the oysters, and that 68% of the oysters in the bedding grounds were dead at that time. His testimony was unqualifiedly to the effect that the mud and silt, three to four inches deep, was over the entire lease and was sufficient to smother and kill oysters. It was his opinion that heavy boat and barge traffic through the canal which traversed the northern portion of the lease in question could account for the silt deposits over this lease. He again examined this lease in August, 1957, and found the lease still heavily silted. At that time he was informed by the respondent that the Southern Natural Gas Transmission Company was laying a pipeline across the lease, and plaintiffs then blamed this activity for the damage to their oyster bedding grounds. At that time Mr. Ferac concluded that approximately 90% of the oysters in the lease were dead. This expert, on his survey of the lease in August and September of 1957, found no dead grass on the lease south of the canal

which traversed the northern portion of the lease. This finding was contrary to the finding of the plaintiffs' expert, Dr. St. Amant, who testified that he did find dead grass which he assumed resulted from the activities of the marsh buggies in close proximity to the lease. Mr. Bennett, an employee of the Louisiana Wildlife and Fisheries Department, was assigned to work with Marine Exploration Company during these operations. He testified that prior to the commencement of operations he probed for oysters and found only shells. He further insisted that at no time did the marsh buggies traverse the lease. Mr. Punt Sisung, a deputy sheriff, testified that two days after plaintiffs claimed that the respondent had damaged their oysters, he examined the lease and found 80% of the oysters dead and the entire lease covered with silt. Thus, it is obvious from the testimony in this case that it is highly doubtful that the alleged destruction of the oysters on these oyster bedding grounds had any causal connection with the activities of the respondent's oil exploration activities. Certainly, to say the least, the plaintiffs have failed to prove by a preponderance of the evidence that such causal connection existed.

And, as heretofore stated, even had the Court found a causal connection between the death of the oysters and the activities of the respondent, the plaintiffs have completely failed to prove with any degree of certainty whatsoever the amount of any damages that might have been sustained thereby. For these reasons, the demands of the plaintiff against Marine Exploration Company must be rejected.

This brings us to a determination of the third party claim by Marine Exploration Company against Phillips Petroleum Company. Of course, in view of the decision in the main case, the third party claim automatically falls insofar as judgment over is concerned. But Marine also demands from Phillips reasonable attorney fees and costs for defending this suit, claiming that they are entitled to such under the terms of their contract. Phillips, on the other hand, demands attorney fees and costs from Marine, contending that the same contract obligates Marine, rather than Phillips, to defend such an action as this. The pertinent parts of the contract involved are as follows:

"XI.

"Except as provided in Article V above, MARINE agrees to assume and hold CLIENT harmless from any and all claims, damages or liabilities and all expenses and costs incident to the settlement or litigation thereof arising out of MARINE'S operations hereunder, whether such claims, damages or liabilities result from alleged or actual injuries to persons or property, except that CLIENT assumes and agrees to pay for all claims, damages or liabilities and all expenses and costs incident to the settlement or litigation thereof arising out of or resulting from any one of the following sets of circumstances:

"1. Injury or death of any officer, employee or agent of CLIENT, when not due to the negligence of MARINE.

"2. Instances in which it will become evident to MARINE that it will be necessary to cause damage to property in order to obtain the information and data requested by CLIENT. In such event, MARINE shall notify CLIENT with an estimate of the cost or amount thereof. Upon receipt of such notice and estimate, CLIENT shall instruct MARINE whether to proceed with or refrain from the work expected to result in such damage. If CLIENT shall authorize MARINE to proceed with such work, then CLIENT shall be liable for the resulting damages to the extent of the estimate submitted by MARINE.

"3. Instances in which a trespass occurs, but MARINE has entered upon the lands either under color of license or permit and in good faith, or with written permit or oral permission from the occupant or owner of the land or in which such trespass was not foreseeable by the use of ordinary precautions.

"4. Instances in which MARINE pays questionable claims or damages upon instructions of CLIENT in order to retain the good will of landowners it shall be the responsibility of CLIENT to institute or to initiate the negotiations in this regard. MARINE shall not be required to contact CLIENT in the settlement of claims for which MARINE is responsible arising under this agreement, but shall proceed with the settlement of such claims in a usual and ordinary procedure.

"(a) CLIENT shall assume responsibility for any claim for damage resulting from the failure of CLIENT to obtain a valid or sufficient permit, if obtained by CLIENT, for MARINE to conduct operations hereunder upon any land or waterways designated by CLIENT, or its said representative, for such operations.

"(b) CLIENT shall assume responsibility for any claim for damage to trapping grounds, oyster beds, fishing grounds, the pollution thereof, and damages to all wild life."

In this agreement, "MARINE" refers to Marine Exploration Company, and "CLIENT" refers to Phillips Petroleum Company.

 Phillips contends that under the provisions of the first paragraph of Article XI, Marine is liable to them for attorney fees and costs. It is their position that the present litigation does not fall into any of the exceptions contained in sub-paragraphs 1, 2, 3, or 4. They further contend that the sub-paragraphs (a) and (b) under sub-paragraph 4 refer only to questionable claims which have been paid by Marine, and thus are not applicable here. Marine, on the other hand, contends that sub-paragraph (b) under sub-paragraph 4 clearly covers the situation and that thus, Phillips is liable to them for attorney fees and costs.

It is the opinion of this Court that the position taken by Marine is well founded, and that Phillips is liable to Marine for reasonable attorney fees and costs incurred in connection with the defense of this suit. Why sub-paragraphs (a) and (b) are so numbered and placed under sub-paragraph 4 is difficult to explain. Sub-paragraph (b) is clear and unambiguous. It unqualifiedly obligates Phillips to assume responsibility for any claim for damages to oyster beds. It does not so obligate them only if such claims have been paid by Marine upon instructions of Phillips. The obligation of Phillips for any claim for damages to oysters or oyster beds is clear and unambiguous. This obligation to pay such claims also includes the payment of reasonable attorney fees and costs in connection with such claims. Pure Oil v. Geotechnical Corp. of Delaware, D.C., 129 F.Supp. 194. The main part of sub-paragraph 4 imposes a general obligation covering all questionable claims paid by Marine upon instructions of Phillips. Sub-paragraph (b) imposes a specific obligation to pay specific types of claims, including claims for damages to oyster beds, whether these claims have been paid by Marine or not. During the trial of this case, counsel for Marine and counsel for Phillips respectively stipulated that a reasonable attorney fee insofar as Marine was concerned for the defense

of this suit through July 11, 1962, would be the sum of $1,600. Since that time, counsel for Marine participated in the trial of the case, which trial consumed the better part of three days. In addition to that, it was necessary for counsel to prepare and submit briefs and other memoranda requested by the Court. Taking all of this into consideration, it is the opinion of this Court that Marine Exploration Company is entitled to recover from Phillips attorney fees in the amount of $2,250, together with other necessary and provable costs incurred in defending this suit, if any.

Judgment shall be prepared by counsel for Marine Exploration Company in accordance herewith, and presented for signature.