YORK COVE CORPORATION et al.,
Plaintiffs,

v.

UNITED STATES of America,
Defendant and Third-party
Plaintiff,

v.

T. A. LOVING AND COMPANY,
Third-party Defendant.

YORK COVE CORPORATION et al.,
Plaintiffs,

v.

T. A. LOVING AND COMPANY,
Defendant and Third-party
Plaintiff,

v.

UNITED STATES of America,
Third-party Defendant.

Civ. A. Nos. 954, 955.

United States District Court,
E. D. Virginia,
Newport News Division.

Sept. 23, 1970.

Edward Wolcott, Norfolk, Va., for plaintiffs.

William Gwatkin, III, Admiralty & Shipping Section, U. S. Department of Justice, Washington, D. C., for the United States.

William L. Shapero, Maurice B. Shapero, and Harold P. Juren, Norfolk, Va., for T. A. Loving & Co.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

These cases, involving common questions of law and fact, are actions in which the plaintiffs, alleged lessees and assign-

ees of certain oyster planting grounds by reason of leases granted by the Virginia Commission of Fisheries, seek damages for the destruction or diminution in value of said oyster grounds in the York River adjacent to the Naval Weapons Station at Yorktown, Virginia. Civil No. 954 is an action under the Federal Tort Claims Act, 28 U.S.C., sections 1346(b), 2671–2680. Civil No. 955 is a direct action against T. A. Loving and Company (Loving), an independent contractor engaged by the Government to construct an addition to the pier facilities at the Naval Weapons Station. In third-party proceedings the Government and Loving claim indemnity against each other, but at all times each primary defendant has denied liability to the plaintiffs.[1]

We start with the year 1918 when, by Presidential Proclamation dated August 7, 1918, 40 Stat. 1820, 1827–1828, the United States acquired property for a Navy Mine Depot on the southern shore of the York River, near Yorktown, Virginia. The described land, as supplemented by an additional Presidential Proclamation dated November 2, 1918, 40 Stat. 1868, 1871–1872, also contained the following language:

"[T]ogether with all riparian rights, privileges, easements and other rights whatsover, appurtenant or appertaining in any way to said above described tract of land and all privately owned rights in the waters lying between the low water line of said tract and the bulkhead or pier head line in the York River as such line or lines may be hereafter established."

By Act of Congress of July 1, 1918 Pub.L. No. 182, 65th Cong., 2d Sess.,

40 Stat. 704, 722, 738), the Proclamation was authorized and specifically provided that the Government was to make just compensation for the lands taken, and further stated that the title to all property so taken for naval purposes was immediately vested in the United States.

At the time of the Presidential Proclamations there were 21 oyster leases in the waters adjacent to the Mine Depot, with 10 of these leases being in the York River between the low water mark and the pier head line. The United States paid compensation for these grounds, but the largest leaseholder, Claude J. Tignor, later brought suit in the Court of Claims. Ultimately Tignor was awarded a judgment in the sum of $14,625 for his grounds. Tignor v. United States, 65 Ct.Cl. 321 (1928). The Tignor lease encompasses the same grounds assigned to Robert J. Watkins and thereafter transferred to York Cove Corporation.

By Act of March 16, 1918, Acts Va.1918, c. 382, the General Assembly of Virginia ceded exclusive jurisdiction[2] to the United States for all purposes over any lands in Virginia acquired by the United States for military or naval purposes, whether before or after the enactment of the cession statute. The latter statute contained a proviso that "whenever such land or buildings shall abut upon the navigable waters of this State, such jurisdiction so ceded shall extend to and include such of the underwater lands adjacent thereto as lie between the low water mark and the bulkhead or pierhead line as now established or as such lines may be hereafter established." This cession of jurisdiction was to continue as long as the United States should own or occupy such lands or any right or interest therein.[3]

1. In view of the conclusions herein reached, it is unnecessary to consider the respective indemnity claims. However, it clearly appears from the contract documents that Loving assumed all liability with respect to damage to private property resulting from Loving's fault or negligence, including an outright agreement to make "good" all damage resulting from Loving's actions. United States v. Seckinger,

397 U.S. 203, 90 S.Ct. 880, 25 L.Ed. 2d 224 (1970); United States v. Hollis, 424 F.2d 188 (4 Cir., 1970).

2. The right to serve civil and criminal process was retained by the cession of jurisdiction.

3. In 1936, the General Assembly of Virginia repealed the 1918 cession statute. As applied to this case, the point is im-

The Navy Mine Depot was erected and the property has been continuously in use to the present day. On May 15, 1926, the Commonwealth of Virginia leased back from the United States all submerged lands in the York River adjacent to the Mine Depot lying between the low water line and the pier head line. This area included the York Cove holdings which are the subject of this controversy. The purpose of this lease was to enable Virginia to sub-lease the submerged lands for oystering purposes. The lease further provided that "the sub-leases will not be permitted to interfere with any naval activities in the waters of the York River," and "that the Government under no circumstances will be held liable for damages to the oyster beds so sub-leased." The lease between Virginia and the United States was for five years, with the right of renewal, but was revocable at any time at the option of the United States. The lease expired on May 15, 1931, and was not renewed. Actually the Virginia Commission of Fisheries did not assign any oyster grounds under this five-year lease. With the exception of a limited area not pertinent to this case, Virginia has never obtained any relinquishment of the interest of the United States in the submerged lands encompassed in the five-year lease.

On October 9, 1936, the Secretary of the Navy, acting for the United States, and the Commissioner of Fisheries, acting for the Commonwealth of Virginia, executed an agreement with respect to certain submerged lands lying upstream from Sandy Point, whereby the United States consented to the use of the submerged lands for oystering purposes under certain conditions, one of which provided "that the Government under no circumstances will be considered or held liable for damages to any oyster beds or other property within the area covered by this instrument." The agreement, indeterminate but revocable at any time at the option and discretion of the Secretary of the Navy, further provided that oystering operations shall not be permitted to interfere with naval activities in the waters of the York River and, upon demand of the Secretary of the Navy, oyster ground leases would be terminated. Pursuant to this agreement the Virginia Commission of Fisheries assigned certain oyster grounds to the Chesapeake Corporation, these grounds adjoining the uppermost lease allegedly held by the plaintiffs and sometimes referred to as the Hansen lease. However, below Sandy Point, the United States has not entered into any agreement as to the use of the submerged lands, nor has it otherwise released its exclusive jurisdiction granted by the cession statute of 1918.

At an undisclosed time the Navy Mine Depot became known as the United States Naval Weapons Station. Prior to March 1959, the Navy proposed to expand its explosive-handling pier facilities at the Weapons Station, thus necessitating deeper channels in the pier area and increasing the navigability of the York River. On April 1, 1960, the Commanding Officer of the Weapons Station notified the Virginia Commission of Fisheries by letter that additions to the deep water pier facilities were to be constructed within two years, and that the existing security areas would be doubled in an upstream direction. On June 27, 1961, the project was authorized by Congress, and funds were appropriated on September 26, 1961. Prior to the expansion project the pier facilities consisted of a pier running from the shore to the channel, a distance of approximately 1,950 feet, connecting with another pier paralleling the channel extending upstream about 1,000 feet. The expansion project contemplated an extension of the parallel-channel pier about 1,250 feet further upstream, with the upstream end being connected with a new pier running to the shore a distance of approximately 2,600 feet.

material. Once jurisdiction is ceded, it cannot thereafter be revoked by the unilateral action of the Commonwealth of Virginia. United States v. Unzeuta, 281 U.S. 138, 143, 50 S.Ct. 284, 74 L.Ed. 761 (1930).

By letter dated October 6, 1961, the Navy advised the Army Corps of Engineers of the expanded project, including a provision for a 35-foot channel depth along the new parallel-channel pier and a 16-foot depth along the pier coming out from shore. The Navy recommended the expansion of an existing prohibited area for security and safety reasons due to the hazards incident to handling high explosives. At that time the prohibited area was approximately 900 yards square, covering the piers at Stony Point extending about 450 yards upstream and downstream, and about 900 yards from the shore to the York River channel. The expanded project would nearly double the size of the prohibited area. Acting upon the Navy's recommendation the District Engineer, on October 17, 1961, issued Public Notice No. 61–26, advising the general public of the requested expansion of the prohibited area, and inviting criticism or protests. None were forthcoming and, on December 7, 1961, the District Engineer recommended approval of the Navy's request to the Secretary of the Army. On February 26, 1962, the Secretary of the Army, acting pursuant to his authority delegated to him under the Rivers and Harbors Act of 1917, 33 U.S.C., section 1, prescribed a navigation regulation expanding the prohibited area. It was accordingly published in the Federal Register on March 14, 1962, 27 F.R. 2465.

At this point we divert to review the actions of the plaintiffs and their predecessors. On February 17, 1959, Robert J. Watkins,[4] later the principal officer of York Cove Corporation, filed an application with the Virginia Commission of Fisheries seeking an oyster ground lease for 250 acres in the York River downstream from Sandy Point, which area was apparently below the

space where the United States had consented to the assignment of oyster grounds by the Commission of Fisheries pursuant to the agreement of October 9, 1936. No action was taken on this application and it lapsed by operation of law. Code of Virginia, 1950, section 28–124. Watkins thereafter filed a second application,[5] after having been advised by the Commission of Fisheries that he would have to obtain clearance from the Navy.

█ Watkins encountered the customary difficulties when dealing with various branches of the Government. Neither Watkins nor the Commission of Fisheries can be criticized for interpreting the letters as an indication that leasing of oyster grounds was permitted. The Naval Weapons Station letter stated that Virginia owned the bed of the river extending beyond the low water mark and that the granting of oyster ground leases "there" was under the cognizance of State authorities. Watkins, through the assistance of Congressman Thomas N. Downing, obtained a letter from the Chief of Naval Operations relating to "prohibited and restricted areas." The difficulty is that the Congressional inquiry dealt in terms of prohibitions, security and safety. There was no official relinquishment of any legal interest of the United States in the submerged areas. The Secretary of the Navy is the proper official to legally relinquish such interests and, of course, the initial inquiry would be through the Judge Advocate General.

██ The mere absence of any regulation restricting navigation has no effect upon any ownership interest in the underwater lands. Even if the oyster ground leases were validly granted, such grant would be subservient to the ownership interests of the United States.

---

4. Watkins, an attorney, was apparently associated with other individuals in this endeavor. W. P. Hunt, W. Garland Evans and Linwood I. Burcher, named plaintiffs herein, were interested. Burcher was the brother-in-law of E. Glenn Phillips, the oyster inspector primarily in charge of as-

signing oyster grounds in the area involved.

5. Filed November 20, 1959, according to a discovery deposition which is not a part of the official record.

■ Acting pursuant to an interpretation indicating no objection by the Navy, but without stating that the United States had legally relinquished ownership in the submerged lands,[6] the Commission of Fisheries granted two leases, one for 30.9 acres and the other for 250 acres, to Henry B. Hunt and Robert J. Watkins, respectively. The Oyster Inspector's Assignments were dated November 17, 1960. The 30.9 acre tract is immediately west and southwest of the original prohibited area, and the 250 acre tract assigned to Watkins is west of the aforesaid 30.9 acre tract and also west of a public ground area, the latter lying adjacent to the prohibited area and immediately north of the 30.9 acre tract.

■ Watkins did not accept the invitation for further clarification with respect to rights acquired under oyster ground leases assigned by the Commissioner of Fisheries. On November 23, 1959, he, accompanied by Oyster Inspector E. Glenn Phillips, visited Commander Lloyd, the Public Works Officer, with

Paul M. Smith, a civil engineer attached to the Naval Weapons Station, also present. According to Smith, he objected to any leasing of oyster grounds because of the contemplated expansion of waterfront facilities whereupon, again according to Smith, Watkins said that he would relinquish all rights of the oyster grounds at no cost to the government. This statement is denied by Watkins but we do not think it essential to determine this conflict as Commander Lloyd certainly had no authority to divest the United States of whatever ownership interest it may have had to underwater land in the area.

On November 25, 1959, Watkins wrote to Commander Lloyd requesting a letter indicating that Lloyd's office had no objection to Watkins' application for oyster planting grounds. Lloyd's response, while not specifically stating that the Navy had no objections, merely states that the United States was vested with exclusive political jurisdiction over the waters of the York River to the pier head line, but that the granting of oyster grounds was in the hands of the state

6. The letter from the Chief of Naval Operations to Congressman Downing, dated November 3, 1959, after referring to certain restrictions as shown on a U. S. Coast and Geodetic Survey Chart, states: "The Norfolk District, U. S. Army Corps of Engineers, has provided information which serves to clarify these restrictions. While trawling, dragging, and net fishing are prohibited in the restricted areas described in Article 207.-128, oystering is permitted. Your attention is invited to the regulations pertaining to the Explosives-Handling Berth, which require that vessels not be anchored within three hundred yards of this berth when it is occupied by a ship handling explosives. In addition, none but naval vessels may enter the prohibited area which surrounds the piers at the Naval Weapons Station, Yorktown. There are no prohibitions against fishing or oystering in the area outlined in Article 202.166. In the area covered by Article 207.128a, fishing is not prohibited, and oystering may be permitted provided that permission is obtained from the Officer in Charge, Cheatham Annex, U. S. Naval Supply Center Norfolk, Williamsburg, Virginia. Except in cases of emergency, vessels may not anchor in the areas designated as naval anchorages without permission of local naval authorities, obtained through the Captain of the Port, U. S. Coast Guard, Norfolk.

"It is suggested that if additional clarification or more specific information is required, it may be obtained from the Norfolk District, U. S. Army Corps of Engineers, or the Commandant, Fifth Naval District, U. S. Naval Base, Norfolk." Congressman Downing's letter of October 21, 1959, requested information as to whether "oyster grounds in the York River, Virginia, off the Colonial National Historical Park are still under restriction." The letter goes further and states the Congressman's assumption "that the grounds can now be made available to the Fisheries Commission of Virginia." To what extent Admiral Renkin's letter of November 3, 1959, took into consideration the legal implications arising from making the grounds "available to the Fisheries Commission of Virginia," we do not know. In any event, we hold that the Director of the Logistic Plans Division is without authority to waive any superior rights in the property in behalf of the United States.

authorities and, in the event a lease was granted, provision should be made for contingencies as to future Navy facilities in the area. Armed with the letters from Commander Lloyd and the response to Congressman Downing's inquiry, Watkins went to the Commission of Fisheries. No effort was made by Watkins or the Commissioner to contact any legal officer attached to the Navy.[7]

Prior to April 6, 1960—approximately seven months before the oyster ground leases were assigned—the Commissioner of Fisheries received a notice of protest from the Commanding Officer of the Naval Weapons Station advising that the Navy was planning to construct substantial additions to the deep water facilities which would result in doubling the size of the prohibited area in an upstream direction. Watkins was present at the hearing conducted by the Commission of Fisheries on April 26, 1960, although he does not recall same. In any event, following the hearing Watkins' application was approved "subject to any restriction which the Federal Government may enact in the future."

When the grounds were surveyed for the Watkins' lease, the plat contained the words, "Lease subject to any restrictions which Federal Government may enact." As to the 30.9 acre tract assigned to Hunt contemporaneously with the Watkins lease, there is no mention of any protest or hearing, and apparently no restrictive endorsement was placed upon the plat or survey, even though the area covered by the Hunt lease was closer to the prohibited area.

Effective April 3, 1961, Watkins and Hunt assigned their respective leases to York Cove Corporation.[8] While the status of this corporation may have been uncertain as of the date of the filing of these actions due to its dissolution by operation of law on June 1, 1963, a certificate of reinstatement was subsequently issued and we assume arguendo that the plaintiff corporation may properly maintain these actions.[9]

While the Navy had knowledge that Watkins had applied for an oyster ground lease by reason of the protest registered which resulted in the hearing of April 26, 1960, the Navy office responsible for the real estate interests did not realize that such leases existed until the late summer of 1961. Representatives of the latter office visited Hunt, the lessee of the 30.9 acre ground, on September 19, 1961, and advised that the Navy contemplated the construction of a pier in the neighborhood of his purportedly leased ground. A chart was exhibited to Hunt showing the anticipated construction, the enlargement of the prohibited area, and the proposed dredging location from the river bottom. The prohibited area as contemplated took in the entire Hunt lease and the eastern or downstream end of the Watkins lease. The new pier extended along the western line of the Hunt area, and the dredging was to be done in the downstream corner of the Watkins lease and the offshore side of both leases.

On October 26, 1961, the Navy notified York Cove that the former had requested the expansion of the prohibited area; that the expansion would include all of the Hunt lease and a portion of the Watkins lease. The letter concluded:

"Accordingly, the purpose of this letter is to give you timely advice of this proposed action in order that you may remove any oysters from these grounds and minimize any damages you may incur as a result of being precluded from entering the area."

---

7. The record discloses considerable correspondence between the then Commissioner of Fisheries and the Navy between 1930 and 1936, same relating to leases. Apparently no effort was made by the Commissioner to examine the past history with respect to leasing oyster grounds in the general area.

8. The transfer documents reflect that the same were not acknowledged until April 4, 1961, but were approved by the Oyster Inspector on April 3, 1961.

9. York Cove also took an assignment of grounds originally assigned to John Hansen.

York Cove, acting through Watkins, responded by referring to the area "for expanding the pier facilities," and stating that during the first week in October 1961, some 3,566 bushels of seed oysters had been planted in the area [10] and that these could not be removed, but that York Cove would do everything practicable in minimizing its damages with respect to mature oysters. The Navy replied by letter dated December 4, 1961, advising that the expanded prohibited area would include the 30.9 acre Hunt lease, and 51 acres of the Watkins lease.

On April 16, 1962, the Navy advised York Cove that the prohibited area had been expanded pursuant to an order of the Secretary of the Army, but stating that the Navy had no objection to lessees removing the oysters until July 1, 1962. Mature oysters are generally harvested in the spring and the time required to dredge the area was ample. It is conceded that no oysters were removed or harvested by the plaintiffs. Notice to Hunt on September 19, 1961, was notice to York Cove.

The construction of the pier commenced a few days after July 1, 1962, through the independent contractor, Loving. Instead of working out from shore, Loving elected to dredge an access channel to permit the driving of piles from floating equipment. The channel, 100 feet wide, ran about 600 feet long on the upstream side and approximately 500 feet on the downstream side. The depth of the excavation was 5 feet of river bottom. The dredged material was placed on both sides of the channel at an approximate distance of 30 feet from each edge as an outer limit. The dredged material was awash at high tide, with a height of 2.5 feet at low tide.

When the pier was completed the dredged material was used as backfill, with an estimated 85% of the total quantity being placed back under the pier.

We deem it unnecessary to determine the quantity of dredged material which may have drifted over York Cove's oyster grounds. At best it would be highly speculative but, if liability is reached, we assume that some estimate could be made. We conclude, however, that the plaintiffs are not entitled to recover at the hands of either defendant.

### THE CASE AGAINST THE UNITED STATES

We think it clear that, under the pertinent authorities, the United States was acting under its dominant navigational servitude in doing the work involving the construction of the pier and dredging incident thereto. The rationale of United States v. Commodore Park, Inc., 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945) leads to the conclusion that where the Government's action is of some benefit to navigation and commerce, the fact that it is also for the benefit of the Navy's shore facilities is immaterial. Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154.

In the earlier case of Greenleaf-Johnson Lumber Co. v. Garrison, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939 (1915), where the Secretary of War altered the harbor line in the Elizabeth River to give the Navy more room for mooring its vessels at the Navy Yard, the Supreme Court said (237 U.S. 268, 35 S.Ct. 557):

"The mooring of vessels is as necessary as their movement, and the navigability of a river can be maintained or increased as legally for the accommodation of war vessels as for trading

10. When Hunt was interviewed on September 19, 1961, he indicated that only a small quantity of seed had been planted. Evans, a co-plaintiff, claims to have planted 417 bushels on or about October 12, 1960, which was prior to the date the leases were assigned to Watkins and Hunt. As to this quantity, about 350 bushels were placed at the downstream end of the Hunt lease in 6 to 9 feet of water, and the remaining 67 bushels were planted in the middle of the Watkins lease. Evans also testified that in October 1961, he planted 3,168 bushels in the Watkins lease area.

vessels, those of public ownership as well as those of private ownership, and we cannot enter into a consideration of what may be necessary for either purpose."

While it is true that the relocation of the harbor line in *Greenleaf-Johnson* was in conjunction with the deepening of the channel, and therefore for the benefit of navigation in general, we must conclude that no valid distinction can be drawn under the language quoted above.

Other authorities tending to support the position of the Government are Blake v. United States, 181 F.Supp. 584 (E.D.Va., 1960), aff'd, 295 F.2d 91 (4 Cir., 1961); Scranton v. Wheeler, 179 U.S. 141, 21 S.Ct. 48, 45 L.Ed. 126 (1900); Lewis Blue Point Oyster Co. v. Briggs, 229 U.S. 82, 33 S.Ct. 679, 57 L. Ed. 1083 (1913); Bailey v. United States, 62 Ct.Cl. 77 (1926), cert. den. 273 U.S. 751, 47 S.Ct. 455, 71 L.Ed. 873 (1927); United States v. Virginia Electric & Power Co., 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961); and United States v. Chicago, Milwaukee, St. Paul & Pacific R. R. Co., 312 U.S. 592, 61 S. Ct. 772, 85 L.Ed. 1064 (1941). Plaintiffs cite cases in the Court of Claims filed under 28 U.S.C., section 1497, and not under the Federal Tort Claims Act, which are inapposite for the reason stated above, or are otherwise distinguishable. Nor is Carr v. United States, D.C., 136 F.Supp. 527, decided by this court in 1955, applicable. In that case, oyster beds were damaged by dragging operations following an airplane crash. Finally, plaintiffs rely upon United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950), and United States v. 412.715 Acres of Land, 53 F.Supp. 143 (N.D. Cal., 1943). In *Gerlach* the defense of dominant navigational servitude was rejected where Congress had treated the project as one of reclamation, rather than navigation, and had indicated an intention to compensate private property owners for damage to their rights. Closest

in point to lend force to the arguments of plaintiffs is the *412.715 Acres of Land* case where the United States acquired land for the construction of a naval supply depot and urged that no compensation was payable for the land condemned below the mean high water line because it was acting pursuant to its navigational servitude. The district court rejected this argument. The Fourth Circuit in *Blake* distinguished the foregoing case by noting, "in that case it was found as a fact that the Government in changing the navigability of the waters acted for its own benefit only to the exclusion of the public." In the present case the Government urges that *417.715 Acres of Land* has been overruled by the Supreme Court in *Commodore Park*. We need not reach this determination as we feel that the quoted language in *Greenleaf-Johnson*, combined with the reasoning in *Commodore Park*, is sufficient for us to hold that the defense of dominant navigational servitude must be sustained.

Apparently the plaintiffs' reasoning is that the Government, in making its improvements at the Naval Weapons Station, was not acting pursuant to 33 U.S. C., section 1, but was acting under 33 U.S.C., section 3. Plaintiffs argue that, had the Government proceeded under 33 U.S.C., section 1, the plaintiffs would have been permitted to file their action against the United States in the Court of Claims under 28 U.S.C., section 1497. Moreover, if 33 U.S.C., section 3 was applicable, then the United States would have been subject to the prohibition in that section against unreasonable interference with the food fishing industry. Thus, the plaintiffs say, the Government is seeking to avoid its obligations under both statutes by now asserting for the first time, its defense of dominant navigational servitude.

The United States counters by saying that it proceeded under 33 U.S.C., section 1, in enlarging the prohibited area. This appears to be supported by the exhibits indicating that the Secretary of

**808**

the Army acted pursuant to the authority granted to him by 33 U.S.C., section 1.[11]

It is possible that both 33 U.S.C., section 1, and 33 U.S.C., section 3, may have been relied upon by the Secretary of the Army in issuing these navigation regulations, although the Secretary adopted 33 U.S.C., section 1.

The same argument was advanced in Blake v. United States, 181 F.Supp. 584, 591, but was rejected, and affirmed on appeal.

█ In the main, we think that plaintiffs' reliance upon the Navigation Regulations, is, to a large extent, immaterial. The gist of plaintiffs' injury is not the deprivation of the oyster ground rights by virtue of the changed regulations, but lies in the damage resulting from the dredging and pier construction operations. While a portion of the claim for damages is based upon "loss of use," it appears that only about 80.9 of the total of 280.9 acres may be considered "lost" as a result of the expansion of the prohibited area. In any event, we conclude, as pointed out in *Blake*, that the issuance of Navigation Regulations falls within the scope of dominant navigational servitude.

█ As stated in the factual summary, we also conclude that Virginia had no jurisdiction to assign the oyster grounds in question. Plaintiffs' reliance upon James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937), is misplaced. In that case the cession statute of West Virginia did not cede jurisdiction over underwater lands, whereas Virginia, in the matters here presented, did expressly cede exclusive jurisdiction to the underwater lands adjacent to the Naval Weapons Station. Where exclusive jurisdiction is vested in the United States by cession, the state retains no authority except as may be reserved by the language of the cession statute. Humble Pipe Line Co. v. Waggonner, 376 U.S. 369, 84 S.Ct. 857, 11 L. Ed.2d 782 (1964); Collins v. Yosemite Park & Curry Co., 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502 (1938). Virginia did not reserve the right to assign oyster grounds in the underwater lands over which it ceded exclusive jurisdiction to the United States. Thus it follows, the Virginia Commission of Fisheries had no authority to assign the leases to Watkins and Hunt.

█ The remaining argument is that the plaintiffs relied upon information received from Navy officials to the effect that the Navy had no title to the underwater lands in question. We do not believe that the assurances went this far as they related essentially to "restricted" or "prohibited" areas and had nothing to do with ownership of the underwater lands. Even if and when the restrictions are lifted, such action does not divest the United States of ownership, and the rights of the Government may not be lost by the conduct of officers without authority to act in the premises. United States v. California, 332 U.S. 19, 39–40, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); United States v. Crance, 341 F.2d 161, 166 (8 Cir., 1965), cert. denied 382 U.S. 815, 86 S.Ct. 36, 15 L.Ed.2d 63 (1965). As stated in Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947):

"Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."

A parenthetical note following section 207.128, which is the section which established the restricted and prohibited areas in these cases, would indicate that 33 U.S.C., section 3, may have been relied upon as "additional authority."

11. A note at the beginning of 33 C.F.R., Part 207 (Navigation Regulations) states:
"Authority: §§ 207.1 to 207.900 issued under sec. 4, Stat. 362, as amended; 33 U.S.C., § 1. Additional authority is cited in parentheses following the sections affected."

■ While we entertain no doubt as to the authority of the local Navy officials to permit plaintiffs to conduct oystering operations, subject to the will of the Government, this, we believe, is the limit of authority.

Finally, plaintiffs argue that Virginia could not cede jurisdiction to the United States as to lands to which the United States had no title. The point is without merit. Petersen v. United States, 191 F.2d 154 (9 Cir., 1951), cert. denied sub nom. California v. United States, 342 U.S. 885, 72 S.Ct. 174, 96 L.Ed. 664 (1951). Cf. United States v. Schuster, 220 F.Supp. 61 (E.D.Va., 1963).

## THE CASE AGAINST LOVING

Paragraph 12 of the "General Provisions" of the contract between the United States and Loving states:

> "The Contractor [Loving] shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits. * * *"

Likewise, as to the liability of the United States, it is urged that the Government retained overall control and supervision of the project and, therefore, was responsible for Loving's negligence in performance.

■ While it is true that Loving did not procure a permit, the Government cannot be held liable on this theory. Assuming arguendo that Loving was negligent, the argument that the United States is chargeable with such negligence must fall, as it would clearly fall within the "discretionary function" exception to the Federal Tort Claims Act. In effect, the attempt to hold the United States liable is predicated upon the Government's decision to undertake the project. The fact that the Government retained a large measure of control and supervision over the project, where the work is being done by a reputable independent contractor, does not make the employees of the latter the servants of the United States. Strangi v. United States, 211 F.2d 305 (5 Cir., 1954); United States v. Page, 350 F.2d 28 (10 Cir., 1965), cert. denied 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470.

In Jemison v. The Duplex, 163 F.Supp. 947 (S.D.Ala., 1953), a recovery against the Government was allowed to several wharf owners where dredging operations undermined the piers, same being under the theory that the Government was negligent in ordering the dredging done at too low a level. The court held that the drawing of the dredging plans and specifications was on the "operational" rather than the "planning" level, thus excluding the application of the "discretionary function" exception. The action against the contractor was dismissed, and indemnity over by the United States against the contractor was also denied, although recovery was granted to the wharf owners against the United States under the 56th Admiralty Rule, the contractor having been exonerated since the job had been performed in accordance with the plans and specifications.[12]

■ While there may be some serious question as to whether Loving can be held liable to York Cove, as the Government was apparently aware of the dredging plans and furthermore Loving was performing its work on property owned by the United States, we do not entertain any doubt as to the fact that an independent contractor can be held liable where it performs a contract for the Government in a negligent or otherwise tortious manner. Thus, in Whorten v. T. A. Loving & Co., 344 F.2d 739 (4 Cir., 1965), the same contracting company was held liable when a vessel struck a submerged beam which Loving had negligently left in a canal following the construction of a bridge for the Navy.

■ It is generally held that, while a public contractor is liable for its negligence or wilful torts in performing a contract for the Government, it is not

---

12. The Jemison case has been questioned in Mahler v. United States, 306 F.2d 713 (3 Cir., 1962). An opposite result was reached in F. M. Schaefer Brewing Co. v. United States, 121 F.Supp. 322 (E.D. N.Y., 1954).

liable for "necessary or incidental" damages. See Annot., 9 A.L.R.3d 382, 385, where it is said:

"The problem confronting the courts in many cases is whether, under the fact situation, the damage resulted necessarily, or incidentally, from the carrying out of the contract according to its terms or according to the directions of the contractee, or whether the damage resulted from activity over which the contractor had a choice, either as to its adoption or the method of carrying it out, thus providing a basis for a finding of negligence."

The foregoing principle is illustrated by Converse v. Portsmouth Cotton Oil Refining Corp., 281 F. 981 (4 Cir., 1922), cert. denied 260 U.S. 724, 43 S.Ct. 13, 67 L.Ed. 482. Converse contracted with the Navy to dredge certain areas in the Navy Yard as per detailed plans and specifications. The Navy left the matter of obtaining dumping grounds up to Converse, but the contract specified that, if the dredged materials were deposited on shore, certain designated areas were to be used with Converse making the appropriate arrangements with the landowners. During the dredging operation, a large quantity of dredged materials escaped from the dumping area into an adjacent creek, thereby polluting the creek and destroying its navigability. The injured party, whose business required the use of large quantities of water from the creek, brought an action against Converse to require the restoration of the creek to its former condition. Relief was granted and, on appeal, affirmed. In answer to the contractor's argument that it was merely complying with the Government's contract and should not be held liable for incidental damage resulting from the performance thereof, the Fourth Circuit said (281 F. 984):

"The correctness of this proposition may be conceded when the incidental injury is the necessary and unavoidable consequence of doing the work; that is to say, when the work cannot be done without inflicting the injury. If the desired improvement of this Navy Yard could have been made in no other way than by depositing the dredged material where it would escape into Paradise Creek, and thus deprive complainant of its needful supply of water, it might well be argued that the contractors could not be held responsible. * * * But plainly that is not the case in hand. The improvement in question involved no necessity for filling up Paradise Creek, nearly a mile distant, or affecting in any way the natural flow of its waters; nor did the government, in planning the improvement and providing for its execution, contemplate or intend any impairment of the creek or of the rights of riparian owners. * * * Bidders were advised that they would have the option of using the hydraulic method, in which case the dredged material was to be deposited in named areas, or of loading it on scows to be towed out to sea and dumped, which conclusively shows that interference with Paradise Creek was in no wise necessary to the performance of the work."

The facts in *Converse* are somewhat similar to United States v. Commodore Park, Inc., supra; the principal difference being that *Commodore Park* was an action against the Government, whereas *Converse* was against the contractor.

In Yearsley v. W. A. Ross Constr. Co., 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), it was held that a contractor, performing a Government project involving the construction of dikes to improve the navigability of the Missouri River, was not liable for damage to private landowners, unless the contractor exceeded his authority or the authority was not validly conferred.

While the allegations of Loving's negligence are not stated with clarity, they appear to be threefold: (a) the failure of Loving to get a work permit from the Army District Engineer as required by 33 U.S.C., section 403, and 33 C.F.R., section 209.130; (b) the depositing of spoil on either side of the dredged chan-

nel, rather than using some alternate method of disposal; and (3) the failure to stop dredging after plaintiffs warned Loving that the oyster beds were being damaged.

■ As to the issue respecting the failure to get the permit, it is conceded that it was not obtained through an oversight on Loving's part. We agree, however, that the purpose of obtaining a work permit in such a situation is to protect navigation interests, and not the possible interests of oystermen. The failure to procure the permit was certainly not the proximate cause of the damage to plaintiffs' oyster beds, whatever the interest in same may have been. Cf. Morrison v. LeTourneau Co. of Georgia, 138 F.2d 339 (5 Cir., 1943).

In considering the use of an alternate method of dredging or disposing of dredged materials, there are a number of cases arising in Louisiana involving damages to oyster interests by the developers of mineral leases; all of which have apparently been decided against the oyster lessees. In Vodopija v. Gulf Refining Co., 198 F.2d 344 (5 Cir., 1952), the dismissal of an oyster lessee's action against the oil lessee was affirmed, where it was alleged that there had been a trespass on the oyster beds in the process of drilling an oil well and laying pipe lines. Gulf Refining had dredged a channel 90 feet in width and 2 feet deep across a portion of the oyster lease for the purpose of hauling in a drilling barge and equipment, thus causing mud and other waste material to be deposited on the oyster beds. The court pointed out that "the burden of proof was on the plaintiff to show that in exercising its rights under the mineral lease the defendant had not used due care but has negligently injured plaintiff."

The same plaintiff in Vodopija v. Tennessee Gas Transmission Co., 152 F. Supp. 14 (E.D.La., 1957), demanded damages where the defendant dredged a canal, 40 feet wide and 8 feet deep, across the mouth of a bay where oyster leases were located. The spoil was placed in banks on either side of the canal for approximately 30 days after which it was replaced in the canal, with an estimated 15% loss of spoil.[13] In holding for the defendant the court noted, "From the description of operations connected with the dredging of the canal and the construction of the pipeline, this court is convinced that the operation was performed in accordance with sound and accepted engineering practice and with due regard to the rights of others holding oyster leases in the area."

Again, in Collins v. Texas Company, 267 F.2d 257 (5 Cir., 1959), a plaintiff-oyster lessee was held to have failed to meet the burden of proving that an oil lessee had not exercised prudence and due care in dredging a channel for the purpose of laying a pipeline. Like in the present case, a bucket type dredge was used and the spoil was placed upon adjacent marshland along the banks of the cut. The court held that plaintiff had failed to show that a different method of dredging would have been better, or that the spoil should have been placed further away. As with respect to the case at hand, the evidence indicated that the bucket method of dredging was less harmful to oysters than the hydraulic suction dredge.

Factually the closest case in point is Begovich, Gonzales and Plaisance v. Texas Company, 209 F.Supp. 412 (E.D.La., 1962). The method of dredging was similar to the method in the present case. The court observed that evidence that the suction dredging method would have been practicable was "far from conclusive." Likewise, as in York Cove, the oyster lessees had advance notice of the dredging but did nothing to minimize the loss.

Finally, in Collette v. Marine Exploration Co., 213 F.Supp. 609 (E.D.La., 1963), the court again held that plaintiffs had failed to establish that the oyster beds sustained any damage as a re-

13. The 15% loss is the same estimate as in the case at hand.

sult of defendant's oil exploration operations.

The rationale of the foregoing cases leads to the belief that Loving occupies a comparable legal status to that of the mineral lessees, since Loving had a legal right to conduct dredging operations and its duty was to refrain from unduly or negligently injuring the property rights (if any) of others.

There is evidence in the record which suggests that the hydraulic suction method might have been used, and that the spoil might have been placed ashore. There is also cogent evidence to the contrary, with compelling reasons why such action should not have been taken. The authorities seem to conclude that the hydraulic method is less practical, more expensive, and more harmful to marine life. Collins v. Texas Company, supra; Beacon Oyster Co. v. United States, 63 F.Supp. 761, 105 Ct.Cl. 227 (1946). In the latter case the court said that the use of a suction dredge constituted negligence *per se*.

The Navy Public Works Officer did testify that there was a disposal area on shore which Loving could have used. The contractor's project manager stated that the Navy had advised him not to mess up the shoreline as it was a part of the Colonial Highway at the point where the available disposal area was located. Obviously, from Loving's point of view, it was far more practical to deposit the spoil as close to the channel as possible, due to the fact that the channel had to be backfilled to its original condition upon the completion of the job.

It is significant to note that plaintiffs do not seek to hold Loving responsible for damage in the 80 acre "Prohibited Area" within which the dredging was actually done, but only for the siltation of plaintiffs' beds upstream from this area. These particular beds were approximately 300 yards from the excavation area. We think that it is extremely doubtful as to whether the siltation of these oyster beds were caused by the dredging operations. The dredged channel extended out about 600 feet from shore at a width of 100 feet, with a depth of about 7 feet at mean low water. The test borings taken by the Navy in April 1962 indicate a fine brownish-gray sand, clay, and a trace of shell to a depth of 14 feet below mean low water at the shoreline. At a point 300 feet from shore, the borings reflect fine gray sand, a little shell, and a trace of silt to a depth of 8 feet. Still further offshore at 600 feet where the initial water depth was 3½ feet, there was one foot of fine gray sand under which there was soft gray silt with a trace of sand to a depth of 9 feet. The type of silt which plaintiffs claim damaged these beds was found only between 300 and 600 feet from shore at a depth of from 4½ to 7 feet below mean low water. Moreover, there is evidence disclosing that, in March 1962, a severe storm washed away two or three feet of the bank in the area of plaintiffs' oyster beds, and it is just as probable that this storm may have caused the siltation. It is a settled principle of law that where there are two permissible inferences as to the cause of a loss, only one of which will result in liability, the plaintiff has failed to sustain the burden of proof. Gulf Refining Co. v. Mark C. Walker & Son Co., 124 F.2d 420 (6 Cir., 1942), cert. denied 316 U.S. 682, 62 S.Ct. 1268, 86 L.Ed. 1755; cf. United States v. Huff, 175 F.2d 678 (5 Cir., 1949).

We do not believe that liability attaches merely because, in July 1962, Hunt advised Loving's project manager that Loving was dredging in an oyster bed. Thereafter, when Loving received Hunt's letter dated July 20, 1962, Loving made prompt inquiry of the Government. The Navy answered, by letter dated August 6, 1962, stating that it was immune from liability for any damage to oysters in the prohibited area, and that the Navy believed the immunity extended to Loving as well. Acting upon this assurance, Loving continued its operations. While we do not find that Loving enjoyed the same immunity as the United States, as applied to the facts of this case, the result is the same in view of the holding that Loving performed its work in a prudent manner, without negligence, and that any shore disposal area was im-

practical under the circumstances here presented.

We might add that plaintiffs appear to have been flagrantly guilty of failing to heed an advance warning as to dredging operations. As early as September 1961, plaintiffs were notified that the Navy planned to enlarge the prohibited area. Despite this fact, plaintiffs apparently planted 3,566 bushels of seed oysters in October 1961. By letter dated October 26, 1961, plaintiffs were advised to remove as many oysters as they could in order to minimize the damages. Following public notice the prohibited area was expanded on April 16, 1962, at which time plaintiffs were advised that they had until July 1, 1962, before dredging operations commenced.

██ In the final analysis the issue of Loving's liability rests in whether the method adopted by Loving was reasonable and proper under all the circumstances. We answer that inquiry in the affirmative and hold that plaintiffs have failed to prove, by a fair preponderance of the evidence, that the method adopted was unreasonable, improper, or negligently carried out.

Counsel will prepare an appropriate judgment order dismissing the complaints with costs assessed against the plaintiffs. The court assumes that it is unnecessary to discuss the third-party actions between the United States and Loving.